# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**H.S.**, *et al.*,

     *Plaintiffs,*

**v.**

**DISTRICT OF COLUMBIA**,

     *Defendant.*

**Case No. 1:23-cv-2982-RCL**

## <u>MEMORANDUM OPINION</u>

Z.S. is a student who was formerly enrolled at Powell Bilingual Elementary School ("Powell"), a member of the District of Columbia Public Schools system ("DCPS"), and is now enrolled at a private school.  Her parents, H.S. and A.S., allege that DCPS failed to provide Z.S. with a free appropriate public education ("FAPE") as required by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.  Specifically, the parents allege that Powell failed to timely identify and evaluate Z.S. as a student who may be in need of special education due to a disability, and that the school also failed to adequately respond to other students at Powell bullying Z.S.  The plaintiffs initiated a due process hearing, at which the presiding impartial hearing officer ("IHO") took evidence, made findings of fact, and determined that DCPS had not breached its obligations under the IDEA.

The plaintiffs sued DCPS in this Court.  They reiterate their claims that DCPS fell short of its obligations under the IDEA, and also argue that the IHO erred by crediting the defendant's witnesses over those proffered by the plaintiffs.  The parties have submitted an administrative record and cross-moved for summary judgment.

1

The Court holds that the IHO did not err in his credibility assessments, and affirms the IHO's determination that the school acted in accordance with its obligations under the IDEA. Therefore, the defendant's Motion for Summary Judgment is **GRANTED**, and the plaintiffs' Motion for Summary Judgment is **DENIED**.

## I.    BACKGROUND

### A.  Statutory and Regulatory Background

Congress enacted the IDEA in 1975 to ensure that children with disabilities receive services that meet their unique needs and enable them to obtain an education. 20 U.S.C. § 1400 *et seq.* The Act makes federal funds available to states that comply with the terms of the statute. The core requirement of the IDEA is that states must "establish 'policies and procedures to ensure' . . . that 'free appropriate public education,' or 'FAPE,' is available to disabled children." *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005) (quoting 20 U.S.C. § 1412(a)(1)(A)).

Importantly, under IDEA, it is not enough that school districts make special education services available upon request by an eligible student or his or her parents. Schools have an affirmative obligation to "ensure that '[a]ll children with disabilities . . . who are in need of special education and related services[] are identified, located, and evaluated,'" a requirement known as "Child Find." *Id.* at 518–19 (quoting 20 U.S.C. § 1412(a)(3)(A)). A school's Child Find obligations may be "triggered either by awareness of the child's circumstances or by parental request." *Day v. Kipp DC Pub. Charter Schs.*, No. 19-cv-1223-RBW-ZMF, 2021 WL 3507602, at *4 (D.D.C. Jan. 20, 2021) (citing *Long v. Dist. of Columbia*, 780 F. Supp. 2d 49, 57 (D.D.C. 2011)). "As soon as a child is identified as a potential candidate for [special education] services," the school "must conduct an evaluation to determine whether the child is a child with a disability." *N.G. v. Dist. of Columbia*, 556 F. Supp. 2d 11, 16 (D.D.C. 2008). A "child with a disability" is defined as one who (a) suffers from one of the statutorily-defined disabilities and (b) "by reason

thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A); *see also* 34 C.F.R. § 300.8(a)(1)–(2) (listing the types of cognizable disabilities).

If a child is evaluated and determined to have a disability and be in need of special education services, the school must develop an "individualized education program," or "IEP," for that child. *Reid*, 401 F.3d at 519 (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)). An IEP must "provid[e] personalized instruction with sufficient support services to permit the child to benefit educationally" from the instruction that they receive. *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 203 (1982)).

Implicit in the statute's definition of a "child with a disability" is the notion that some children who suffer from a diagnosable learning impediment nevertheless may not require special education services. *See* 34 C.F.R. § 300.8(a)(2)(i) (explaining that if "a child has one of the disabilities" identified in the regulation "but only needs a related service and not special education, the child is not a child with a disability under this part"). Different interventional approaches may be appropriate for such students, such as a "504 Plan," which is named for Section 504 of the Rehabilitation Act of 1973. *Day*, 2021 WL 3507602, at *4. "A 504 Plan is a 'legal document designed to plan a program of instructional services to assist students with special needs who are in *regular* education settings.'" *Montuori v. Dist. of Columbia*, No. 17-cv-2455-CKK, 2018 WL 4623572, at *4 (D.D.C. Sept. 26, 2018) (emphasis added) (quoting *Parker v. Friendship Edison Pub. Charter Sch.*, 577 F. Supp. 2d 68, 71 n.2 (D.D.C. 2008)).

"Parents may seek administrative and judicial relief if they object to the 'identification, evaluation, or educational placement' of the student, or the provision of a FAPE." *Wimbish v. Dist. of Columbia*, 381 F. Supp. 3d 22, 27 (D.D.C. 2019) (citing 20 U.S.C. §§ 1415(b)(6)(A), (f)(1)). To do so, a parent first submits an administrative due process complaint with the school,

and if the school fails to resolve their complaint, the parent may then request a due process hearing before an impartial hearing officer ("IHO") who renders findings of fact and determines whether the child received a FAPE. *Id.* (citing 20 U.S.C. § 1415(f)(3)(E)(i)). Parties to a due process hearing are entitled to be accompanied by counsel; to present evidence; to present, compel the attendance of, confront and cross-examine witnesses; and to receive a written record of the IHO's determination. 20 U.S.C. § 1415(h). "A party aggrieved by a Hearing Officer's decision ("HOD") may bring a civil action challenging it" in a district court of the United States. *Turner v. Dist. of Columbia*, 952 F. Supp. 2d 31, 34 (D.D.C. 2013) (citing 20 U.S.C. § 1415(i)(2)(A)). If parents make the unilateral decision to place their child in a private school, and an IHO or court later determines that the child was unlawfully denied a FAPE and that the private school placement was proper, the IDEA provides for the parents to "obtain reimbursement . . . for their expenditures on private school education" from the public school system. *Roca ex rel. Roca v. Dist. of Columbia*, No. 02-cv-1646-HHK, 2005 WL 681462, at *4 (D.D.C. Mar. 14, 2005) (first citing 20 U.S.C. § 1412(a)(10)(C)(ii), and then citing *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 10–11 (1993)).

### B. Factual and Procedural Background

H.S. and A.S. first enrolled Z.S. at Powell for pre-kindergarten in the 2014–2015 school year. Administrative Record at 6, 36, ECF No. 10-1 ("A.R."). As a bilingual elementary school, Powell teaches some courses in Spanish and some in English. By the spring of her pre-kindergarten year, Z.S.'s report card gave her a score of "S" (denoting an "area of strength") in all fields except for Spanish Language, in which she was rated "AS" (denoting "an area where we would like to partner to target support for your child"), and Spanish Literacy, in which she was rated an "M" (for "meets expectations"). *Id.* at 36–37. Z.S.'s kindergarten year was 2016–2017,

and her report card showed that by the end of the year she was exceeding expectations in all graded categories except for science, in which she was meeting expectations for her grade level. *Id.* at 6–7, 40. She was rated as "secure" in her comprehension of Spanish, and was able to perform most work, personal, and social functions independently or, in some cases, with limited prompting from her teachers. *Id.* at 7, 42, 44.

In the lead-up to the 2017–2018 school year, Z.S.'s first grade year, Z.S.'s parents began to notice that Z.S. exhibited signs of anxiety, as well as trouble with impulse control and being told "no," so they had Z.S. evaluated by Dr. Abigail Mintz Romirowsky, a psychologist at the Ross Center for Anxiety and Related Disorders. *Id.* at 7, 47–48. Dr. Romirowsky concluded that Z.S. suffered from Separation Anxiety Disorder and noted that, even after being separated from her parents, she continued to "attempt to exert control over situations in which she experiences distress[,] . . . is very sensitive to negative evaluation . . . and she tends to avoid or try to escape from situations that trigger increased distress." *Id.* at 47. Dr. Romirowsky recommended that the school develop a 504 Plan for Z.S., which might include cognitive-behavioral therapy and support from teachers during group-play times, among other interventions. *Id.* at 47–48. Dr. Romirowsky's letter does not, however, recommend that the school evaluate Z.S. for IEP eligibility. The school held a meeting with Z.S.'s parents and instituted a 504 Plan. *Id.* at 512–13.[1]

Z.S. continued to exhibit strong academic and behavioral performance in first grade. Her report card shows that, by the end of the year, she was "proficient" or "advanced" in all graded

---

[1] The IHO's recitation of the facts first makes reference to the creation of a 504 Plan in the fall of the 2018-2019 school year, *see* A.R. at 7, but Z.S.'s mother testified at the due process hearing that one was created during Z.S.'s first grade year, which was 2017-2018. *Id.* at 513. The earliest documentary evidence of Z.S.'s 504 Plan dates to October 31, 2018, the fall of Z.S.'s second grade year. Although the Court notes this seeming discrepancy, it is immaterial for purposes of this litigation.

categories, and was capable of independently performing work, personal, and social functions. *Id.* at 7, 49. Her end-of-year behavioral scores reflected improvement from earlier in the year, when Z.S. reportedly required limited prompting to perform her behavioral functions as expected. *Id.* at 49. Her homeroom teacher's reflections on her social and emotional well-being were mixed: she remarked that Z.S. was "working on have (sic) positive interactions with her friends at all times," but that she "enjoys helping her classmates at her table and both of her teachers." *Id.*

During Z.S.'s second grade year, 2018–2019, a 504 Plan was implemented for Z.S. which identified "communicating" as the "Specific Challenge to be addressed" by the plan *Id.* at 7, 54. The plan called for Powell's staff and teachers to communicate regularly with her parents, to help her adjust to separation from her parents at the start of the school day, and to provide one-week notice of any testing that would occur at school. *Id.* Z.S. continued to receive strong academic and behavioral marks from her teachers in second grade, with her English teacher noting that Z.S. was already capable of reading at a fifth-grade level. *Id.* at 8, 63. Overall, Z.S. showed grade-level proficiency in Spanish, though in many specific areas she was rated as "developing." *Id.* at 8, 61–62. Z.S. had zero unexcused absences that year. *Id.* at 68.

The parents and representatives from Powell revisited Z.S.'s 504 Plan in October 2019, the fall of Z.S.'s third grade year. *Id.* at 8, 69. The meeting summary indicated that Z.S. had been "going to see Ms. Rosenberg," a school counselor, "a lot throughout the school day." *Id.* It explained that "some of what [Z.S.] is doing is work avoidance, mostly . . . [Spanish and] math, both of which are taught in Spanish." *Id.* Because of the "level of social emotional support" that Z.S. seemed to require, "Ms. Rosenberg expressed that it [was] difficult for her to devote" sufficient one-on-one time to Z.S. *Id.* Accordingly, Z.S.'s 504 Plan was updated to add Ms. Hayes, a social worker, as a support person for Z.S. *Id.* Z.S. was to receive four hours per month of

services from Ms. Hayes to focus on coping with anxiety-producing situations. *Id.* at 73. The meeting summary further noted that Z.S. was "having trouble with play or getting into play" and needed assistance "in developing her social skills with her peers." *Id.* at 69. Accordingly, the 504 Plan would be updated to reflect "expanding friendship" as a goal. *Id.*

In January 2020, the services from Ms. Hayes were removed from Z.S.'s 504 Plan because Z.S. refused to engage with her. *Id.* at 8, 87. The parents assented to Z.S. no longer receiving support from Ms. Hayes, and the 504 Plan continued to provide for "check-ins as needed" with Ms. Rosenberg, an adult whom Z.S. evidently trusted. *Id.* at 8, 87.

The latter part of Z.S.'s third grade year and the entirety of her fourth grade year were conducted virtually due to the onset of the COVID-19 pandemic. Grades were not assigned for the final term of the 2019–2020 school year, but Z.S.'s report card for that year generally demonstrates academic performance in line with or exceeding grade-level expectations. *Id.* at 9, 88. However, Z.S. did require limited prompting for certain behavioral tasks, *id.*, and her Spanish performance rated "beginning" or "developing" in all categories, with some improvement over the course of the year. *Id.* at 9, 93. Her fourth-grade report card continued to show strengths in reading, writing, social studies, music, art, and health, and proficiency in science, but her performance in Spanish and math—the two courses taught in Spanish—was below grade-level. *Id.* at 9, 94. Her lagging performance in those two fields was confirmed by two diagnostic tests, the iReady math assessment and the STAR Spanish assessment. *Id.*

In July 2021, before the beginning of Z.S.'s fifth grade year, Z.S.'s 504 Plan was reviewed once again. *Id.* at 9, 102. The 504 Plan team agreed that her accommodations should remain the same. *Id.* at 10, 108. The parents reported that Z.S. continued to suffer from anxiety, and that her sessions with an independent therapist had been paused due to her "constant efforts to control the

conversations," but that she was getting along "pretty well" in summer camp. *Id.* The meeting notes also reflect the 504 Plan team's opinion that Z.S. had "proven to be a leader." *Id.* Z.S.'s mother testified at the due process hearing that she asked Powell representatives whether an IEP might be appropriate around the time of the July 2021 504 Plan meeting, but acknowledges that she did not raise the topic at the meeting itself, nor did she ever specifically or formally request that Z.S. be evaluated for an IEP. *Id.* at 10, 514–15. Z.S.'s mother added that when she asked IEPs, she was told that one would not be appropriate for Z.S. *Id.* at 514–15.

Toward the beginning of Z.S.'s fifth grade year, in September 2021, Z.S. began to report bullying by other students at Powell. The parents informed Powell staff of thirteen instances of alleged bullying between September 8, 2021 and January 14, 2022. *Id.* at 10–13. According to Z.S.'s parents, the alleged bullying "so traumatized" Z.S. that she "no longer want[ed] to attend school" at Powell. *Id.* at 114.

On November 9, 2021, Z.S.'s parents met with the 504 Plan team to review Z.S.'s Plan and discuss the purported bullying incidents. *Id.* at 10. The revised 504 Plan included a handful of new accommodations. Specifically, it provides for all peer conflict to be addressed in real time by an adult and for teachers to be mindful of Z.S.'s relationships with particular peers when grouping students or assigning seats. *Id.* at 10, 165. It also allowed for Z.S. to deliver any assigned verbal presentations one-on-one to her teachers instead of to the entire class if she so chose. *Id.* At this meeting, Powell's staff also noted that Z.S. disliked speaking Spanish in front of her classmates, which may have offended her native Hispanophone classmates. *Id.* at 172. The parties proposed that Z.S. be placed in an "acceleration group" to work collaboratively with her classmates, practice social skills, and build peer relationships, with adult facilitation. *Id.* at 10, 172. The school thereafter placed Z.S. in an acceleration group focused on Spanish. *Id.* at 10, 522. Z.S.'s mother

objected to the selection of Spanish as the subject matter for Z.S.'s acceleration group because Spanish was Z.S.'s worst subject, and testified that this decision backfired, resulting in Z.S. being "ridiculed and bullied even more." *Id.*

The school's representatives shared anecdotal information suggesting that Z.S.'s own behavior was a contributing factor for some of the negative interactions with her peers. *Id.* at 172, 775–76. One teacher, Ms. Joselyn Reyes, reported that five students had informed her that they considered Z.S. to be rude. *Id.* at 172. Powell staff reported that Z.S. sometimes failed to "take other people's perspectives into consideration," that she "[didn't] like to let other students have a chance at sharing," and that she could be "very controlling." *Id.* This is consistent with a later evaluation of Z.S. at the Ross Center (discussed further below) which observed that when Z.S. "perceive[d] something to be unfair," she would "engage in behavioral and emotional meltdowns that [could] occasionally escalate to physical aggression," and that she "demonstrate[d] very limited insight regarding these vulnerabilities and [was] quick to blame others for her own behavior." *Id.* at 232. The school's faculty also attested that they were unaware of much of the alleged bullying because Z.S. typically reported the incidents only to her parents rather than to Powell staff, and because the parents refused to allow Z.S. to join any of their meetings with Powell staff because Z.S. did not want to be perceived as different and they didn't want to betray her trust. *Id.* at 27, 175.

Nevertheless, the school took action to address some of the conflicts between Z.S. and her peers of which it was aware. For example:

- On September 9, 2021, Powell staff admonished one student who had called Z.S. an offensive name; that student promised to refrain from calling Z.S. names going forward and asked Z.S. to partner with him on future class activities. *Id.* at 11.

9

- On or about October 3, 2021, in response to a teasing incident that took place three days prior, Powell's Assistant Principal Morgan Hall made an announcement to the entire grade that teasing would not be tolerated and that students who were overheard teasing others would be required to call their own parents and admit what they did. *Id.*

- On December 14, after an investigation by Powell's Dean of Culture and Climate, Troy Thomas, uncovered that one student had been repeatedly targeting and bullying Z.S., that student was permanently removed from Z.S.'s classroom. The school held a meeting with that student and his or her parents to warn them that further bullying may result in expulsion. *Id.* at 12.

- Most significantly, on December 29, 2021, DCPS formulated a "Targeted Student Safety Plan," which designated various Powell staff members to serve as Z.S.'s trusted adults, recess monitors, and bullying points of contact. *Id.* at 11–12, 187.

On November 23, 2021, Z.S. received what would be her last report card from Powell. She continued to meet or exceed grade level expectations in most classes, but her performance in writing & language, math, and Spanish was deficient, and she required prompting to perform certain behavioral functions, such as participating in class discussions, following rules, and listening to others. *Id.* at 11, 176. She had two unexcused absences. *Id.* at 176.

The parents removed Z.S. from Powell on January 24, 2022, and enrolled her at the Parkmont School, a small private school. *Id.* at 12. Parkmont serves students with academic, social, and emotional challenges, *id.* at 590, but only 15–20% of its student population has an IEP. *Id.* at 613. Z.S.'s teachers at Parkmont are not certified in special education. *Id.* Z.S.'s classes at Parkmont have been taught in English, and she has been able to access the general curriculum there, earning solid grades across the board. *Id.* at 15–16, 24, 199–219.

Sometime shortly before Z.S. was withdrawn from Powell in January 2022, Z.S. was again evaluated at the Ross Center, where it was determined that Z.S. met the criteria for diagnosis with Oppositional Defiant Disorder ("ODD") and an Unspecified Depressive Disorder.  *Id.* at 223. Z.S.'s parents did not share the results of that evaluation with DCPS.  *Id.* 537, 545.  In February 2023, Dr. Meagan Wills, a licensed clinical psychologist, confirmed Z.S.'s diagnosis of ODD, and also diagnosed Z.S. with an Unspecified Mood Disorder and Attention-Deficit/Hyperactivity Disorder ("ADHD").  Dr. Wills expressed her view that Z.S. qualified for an IEP.  *Id.* at 16–17, 233.  Z.S.'s mother testified at the due process hearing that Dr. Wills's assessment was shared with Parkmont, but there is no indication that it was shared with DCPS, as Z.S. had already been withdrawn by that time.  *Id.* at 538.

On May 2, 2023, the parents filed a due process complaint, which resulted in a due process hearing being convened on June 20, 2023.  *Id.* at 5.  The IHO took evidence from both parties and heard testimony from four witnesses for the plaintiffs and seven for the defendant.  *Id.* at 6.  On July 15, 2023, the IHO issued his decision, making findings of fact and holding that DCPS had not violated its Child Find obligations for either the 2021–2022 or the 2022–2023 school year, and had not denied Z.S. a FAPE by failing to keep her safe from bullying during the 2021–2022 school year.  *Id.* at 20–28.

In September 2023, months after the due process hearing had concluded, a DCPS psychologist reviewed Dr. Wills' evaluation, observed Z.S. at school, spoke with her teachers, and ultimately concluded that Z.S. was eligible for an IEP.  *See* Compl. ¶¶ 89–90, ECF No. 1; IEP, Pls.' Mot. for Summ. J. Ex. 1, ECF No. 11-2.  Though this determination is not reflected in the administrative record because it took place after the due process hearing, the defendants do not

contest that Z.S. was ultimately deemed eligible for an IEP.  *See* Def.'s Mot. for Summ. J. 33, ECF No. 14.

Z.S.'s parents initiated this lawsuit on October 6, 2023, seeking judicial review of the IHO's determination.  *See* Compl.  The parents request injunctive relief in the form of an order vacating the IHO's determination, ordering the defendant to reimburse the plaintiffs for their tuition expenses incurred during the 2021-2022 and 2022-2023 school years, and requiring that Z.S. be placed and funded at the Parkmont School going forward.  Prayer for Relief, Compl. at 13.  The plaintiffs also request attorneys' fees and costs.  *Id.*  On March 8, 2024, the plaintiffs moved for summary judgment.  *See* Pls.' Mot. for Summ. J.  The defendant cross-moved for summary judgment on April 9, 2024.  *See* Def.'s Mot. for Summ. J.  The plaintiffs filed their reply on April 23, 2024.  *See* Pls.' Reply, ECF No. 16.  Finally, the defendant submitted its reply on May 3, 2024, making the cross-motions for summary judgment ripe for review by this Court.  *See* Def.'s Reply, ECF No. 18.

## II.   LEGAL STANDARDS

Motions for summary judgment that seek judicial review of an IHO's determination of an IDEA due process dispute take on a somewhat different character than the usual motion brought pursuant to Federal Rule of Civil Procedure 56.  "In reviewing cases under the IDEA, courts will receive the records of the administrative proceedings, hear additional evidence at the request of a party, and make a decision based on the preponderance of the evidence."  *N.G.*, 556 F. Supp. 2d at 17.  In other words, the Court is called upon to "conduct[] a summary adjudication," as though it were presiding over "a bench trial based on a stipulated record."  *L.R.L. ex rel. Lomax v. Dist. of Columbia*, 896 F. Supp. 2d 69, 73 (D.D.C. 2012) (first quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993), and then citing *Phillips v. Dist. of Columbia*, 736 F. Supp. 2d 240, 246 (D.D.C. 2010)).  The party challenging the IHO's determination—in this case, the

plaintiffs—bears the burden of persuading the court that the IHO was wrong. *Reid*, 401 F.3d at 521 (quoting *Kerkam v. McKenzie*, 862 F.2d 884, 887 (D.C. Cir. 1989)).

It is well-established that the IHO's determinations are to receive "less deference than is conventional" in reviews of administrative proceedings. *McKenzie*, 862 F.2d at 887. Nonetheless, a Court entertaining a challenge arising from an IDEA due process hearing does not exercise "unfettered review," and must instead "'afford some deference to the expertise of the hearing officer and school officials responsible for the child's education.'" *Gill v. Dist. of Columbia*, 751 F. Supp. 2d 104, 109 (D.D.C. 2010) (quoting *Lyons v. Smith*, 829 F. Supp. 414, 418 (D.D.C. 1993)). In scrutinizing the administrative record and the IHO's determination, the court must give "due weight" to the IHO's determinations, and "may not substitute its own notions of sound educational policy for those of the school authorities." *S.S. ex rel. Shank v. Howard Rd. Acad.*, 585 F. Supp. 2d 56, 63–64 (D.D.C. 2008) (citing *Rowley*, 458 U.S. at 206). How much deference is due in any given case will "depend[] upon the thoroughness and reasonableness of the administrative proceedings." *Lomax*, 896 F. Supp. 2d at 74. Moreover, "[a] hearing decision that lacks 'reasoned and specific findings deserves little deference.'" *Uhlenkamp v. Dist. of Columbia*, 691 F. Supp. 3d 224, 235 (D.D.C. 2023) (quoting *Kerkam v. Superintendent of D.C. Pub. Schs.*, 931 F.2d 84, 87 (D.C. Cir. 1991)). Conversely, where the IHO offers sound and detailed reasons for his or her decisions, the court should show them commensurate respect, in recognition of the fact that the "Hearing Officer—as opposed to th[e] [c]ourt—has an opportunity to hear testimony in person, examine the demeanor of the witness and reactions of the participants, and can bring immeasurable experience and expertise in this specialized area." *A.I. ex rel. Iapalucci v. Dist. of Columbia*, 402 F. Supp. 2d 152, 170 (D.D.C. 2005); *see also A.D. by E.D v. Dist. of Columbia*, No. 23-cv-2765-BAH, 2022 WL 683570, at *11 (D.D.C. Mar. 8, 2022) (Howell, C.J.) ("It is

undisputed that 'the hearing officer is best positioned to make credibility judgments as to testifying witnesses and resolve factual disputes that amount to inconsistent testimony.'") (quoting *J.T. v. Dist. of Columbia*, 496 F. Supp. 3d 190, 207) (D.D.C. 2020)).

## III.    ANALYSIS

The plaintiffs raise three arguments for why the IHO's determination should be reversed and judgment entered in their favor.  First, the plaintiffs argue that the IHO erred by blindly crediting the testimony of the defendant's witnesses, failing to hold the school to its duty of providing a cogent rationale for its decisions, and discounting (or, in their view, ignoring) the testimony of their own witnesses.  Pls.' Mot. for Summ. J. at 20–27.  Second, the plaintiffs argue that the defendant denied Z.S. a FAPE by failing to identify and evaluate her for an IEP, in violation of its Child Find obligations.  *Id.* at 12–20.  Third, the plaintiffs argue that the defendant denied Z.S. a FAPE by failing to mount an adequate response to the alleged bullying to which she was subject at Powell.  *Id.* at 30–36.  None of these arguments is ultimately persuasive.  The Court will address each in turn.

### A.  The IHO Considered the Witnesses' Testimony, Made Reasonable Credibility Determinations, and Explained His Reasons for Those Determinations

#### 1.  Plaintiffs' Witnesses

After reviewing the record, the Court holds that the IHO adequately considered the testimony of the plaintiffs' witnesses and made sound credibility determinations that the Court will not overturn.

The plaintiffs' first witness was Z.S.'s mother, H.S., who testified in the plaintiffs' case-in-chief and as a rebuttal witness.  A.R. at 505–45, 986–96.  The plaintiffs argue that, as Z.S.'s mother, H.S. is the "greatest 'expert'" on Z.S.'s condition and educational needs, and that her testimony should have been afforded great weight by the IHO.  Pls.' Mot. for Summ. J. at 26.

Contrary to the plaintiffs' suggestion that the IHO failed to adequately consider H.S.'s testimony, the record plainly demonstrates that the IHO carefully listened to H.S. and weighed her testimony when making his factual and legal determinations. For example, the IHO recounted H.S.'s testimony that nothing changed after the creation of Z.S.'s initial 504 Plan, A.R. at 22, 512, but simultaneously acknowledged that Z.S. received above-average grades that year. *Id.* at 22. The IHO also accurately characterized H.S.'s testimony that she had agreed to the termination of the extra social worker services prescribed in Z.S.'s Section 504 Plan for the 2019-2020 school year. *Id.* at 27, 87; *see also id.* at 988 (testifying that "we decided at the time that [Z.S.] was already going through enough stress," and that Ms. Hayes was "removed from the support team . . . at our request"). The IHO recollected that H.S. had objected to Z.S. being placed in an acceleration group for Spanish, her worst class, but the IHO also remarked that "[i]t would seem that the course in which [Z.S.] exhibited the most apprehension would be the most efficacious for this trial." *Id.* at 24. And the IHO's findings of fact note that H.S. had "inquired about the efficacy of an [IEP] for Z.S.," *id.* at 10, but state that "there is no credible evidence that [Z.S.'s parents] *ever* requested an IDEA initial evaluation" of Z.S. *Id.* at 27. That conclusion is supported by the record, which in multiple places indicates that Z.S.'s parents made general inquiries about IEPs, but never asked for an evaluation. *See id.* at 515, 532. In sum, it appears that the IHO carefully considered H.S.'s testimony and balanced it against the entirety of the available testimonial and documentary evidence in reaching his determinations.

The plaintiffs next argue that the IHO wrongfully discounted the testimony of the plaintiffs' expert witnesses. The first such witness was Dr. Paul Livelli, "an expert in special education and the family's educational consultant." Pl.'s Mot. for Summ. J. at 10. Dr. Livelli testified that he had spoken with Z.S. and her parents, observed Z.S. at Parkmont, and spoken with her teachers.

A.R. at 552.  Based on these observations and his review of Dr. Wills' report, Dr. Livelli expressed

his opinion that Z.S.'s 504 Plans were inadequate to provide her with a FAPE, that Z.S. should

receive specialized instruction in a small, structured classroom environment segregated from

students enrolled in the general education curriculum, and that DCPS had violated its Child Find

obligations by not evaluating her.  *Id.* at 553, 565–66, 570–71.

 The IHO determined that Dr. Livelli's testimony was unpersuasive due to internal

contradictions, his apparent lack of knowledge about the educational conditions at Parkmont, and

his shallow familiarity with Z.S.'s educational history.  *Id.* at 21.  Though Dr. Livelli initially

asserted that Z.S. needed a "full-time placement" in an environment "segregated from kids in the

general education population," he simultaneously expressed his view that Parkmont was an

appropriate placement for Z.S.  *Id.* at 565–66.  As noted above, Parkmont does *not* offer a

segregated special education environment of the sort that, in Dr. Livelli's view, Z.S. supposedly

needed: less than 20% of the students in Z.S.'s class had IEPs, and none of Z.S.'s Parkmont

teachers were certified in special education, yet Dr. Livelli averred that Z.S. was "pretty happy

with her experience" and "receiving benefit there."  *Id.* at 564.  Dr. Livelli also conceded on cross-

examination that he had never spoken to any of Z.S.'s former teachers at Powell, had never

performed a formal assessment on Z.S., and that he knew that Z.S. had progressed on-time from

one grade level to the next at Powell, despite being enrolled in a bilingual general education

curriculum.  *Id.* at 573.  Finally, he conceded on cross-examination that some of the documents he

had reviewed in formulating his opinions noted that Z.S. struggled particularly in Spanish and

math, the two courses taught in Spanish at Powell, and he recounted that Z.S. herself had told him

that "it's easier for her to take math without having to take it in Spanish."  *Id.* at 576, 580.  The

IHO concluded that these facts, taken together, suggest that Z.S.'s academic difficulties toward the

end of her experience at Powell could be attributed to Z.S.'s aversion to Spanish, rather than to her separation anxiety disorder—and undermined Dr. Livelli's assessment that Z.S. needed to be placed into a segregated special education setting in order to access the curriculum. *Id.* at 24.

The plaintiffs also introduced the expert testimony of Dr. Wills, who testified about the process by which she diagnosed Z.S. with ODD, ADHD, and an Unspecified Mood Disorder in early 2023. *Id.* at 23, 648–49. The plaintiffs claim that the IHO "seemingly dismissed her opinions because her evaluation was not conducted until after Z.S. had left DCPS and was therefore not relevant to the 2021-2022 school year." Pl.'s Mot. for Summ. J. at 27.

This is not so. Rather than simply "dismiss[]" Dr. Wills's testimony, the IHO clarified how her testimony might bear on the case at hand: because Dr. Wills's evaluation took place more than a year after the parents decided to enroll Z.S. at Parkmont, her findings would be relevant to the question of whether "DCPS should have suspected [Z.S.] of having an IDEA disability during the 2021-2022 school year" *if and only if* "material aspects of [Dr. Wills's] evaluation are clearly applicable" to that school year. A.R. at 23. The IHO's treatment of Dr. Wills's testimony is consistent with well-established case law, which requires that a school's efforts to comply with the IDEA be "judged prospectively, rather than with the benefit of hindsight." *Shank*, 585 F. Supp. 2d at 71. In other words, "[n]either the statute nor reason countenance 'Monday Morning Quarterbacking,'" so "events post-dating" a decision by the school are relevant only insofar as they "shed light on whether the" decision "was objectively reasonable" at the time it was made. *Edward M.-R. ex rel. T.R.-M. v. Dist. of Columbia*, 660 F. Supp. 3d 82, 97 (D.D.C. 2023) (first citing *Moradnejad v. Dist. of Columbia*, 177 F. Supp. 3d 260, 275 (D.D.C. 2016), and then citing *Z.B. v. Dist. of Columbia*, 888 F.3d 515, 524 (D.C. Cir. 2018)).

17

The IHO reasonably concluded that Dr. Wills's evaluation was *not* "clearly applicable" to the 2021-2022 school year.  As discussed above, during her time at Powell, Z.S. was diagnosed with Separation Anxiety Disorder, and her 504 Plans were intended to accommodate that condition.  However, Dr. Wills stated on cross-examination that Z.S. was not suffering from "separation anxiety anymore" and that her anxiety "didn't rise to the clinical threshold of a generalized anxiety disorder" either.  A.R. at 669.  Therefore, and notwithstanding whatever new diagnoses Dr. Wills may have identified in her March 2023 evaluation, it would have no bearing on whether Z.S.'s previous diagnosis and manifestation of Separation Anxiety Disorder should have cued the school that she might be eligible for an IEP and thus trigger an evaluation.  *Id.* at 20.  Nor does Dr. Wills's report convincingly suggest that the school should have been on notice to evaluate Z.S. due to these other diagnoses when she was enrolled at Powell over a year earlier.

The IHO discounted Dr. Wills's testimony for a second reason as well: she agreed on cross-examination that a student's disability implicates the school's Child Find obligations if there is a "showing [of] an educational impact," *id.* at 665, but conceded that she never interviewed any of Z.S.'s teachers at Powell, *id.* at 658, never reviewed any of Z.S.'s report cards from either Powell *or* Parkmont, *id.* at 673, 693, and had only anecdotal knowledge of Z.S.'s academic progress since switching schools.  *Id.* at 693–94.  In other words, Dr. Wills acknowledged that a student must experience some educational impact in order to have a disability as defined by IDEA, but nevertheless opined that Z.S. was disabled without making any meaningful independent effort to gauge Z.S.'s academic progress at Powell or since switching to Parkmont.  This reasonably caused the IHO to discount her evaluation and testimony.  *Id.* at 23–24; *cf. G.S. through Judy S. v. W. Chester Area Sch. Dist.*, No. 21-1680, 2022 WL 2233909, at *3 (3d Cir. June 22, 2022) (District Court did not err by accepting a hearing officer's determination that a witness was not credible

because that witness's report "fail[ed] to consider [the student's] grades and the results of her progress monitoring at school").

As already noted, credibility determinations by an IHO are not entitled to judicial deference if they are rendered in vague or conclusory terms or if they "do[] little to address the concerns raised by" educational professionals called as witnesses. *See M.O. v. Dist. of Columbia*, 20 F. Supp. 3d 31, 41 (D.D.C. 2013). Here, by contrast, the IHO seized upon specific contradictions and gaps in Dr. Livelli's and Dr. Wills's testimony that bear directly on their credibility as expert witnesses, and provided the specific reasons for discounting their testimony in his determination. *See Iapalucci*, 402 F. Supp. 2d at 170 (finding no error where the IHO's determination was "replete with references to the evidence offered by Plaintiffs"); *cf. M.O.*, 20 F. Supp. 3d at 41 (finding that an IHO's determination was not entitled to deference because it contained "no discussion of . . . why the District's review of the evaluations was credited over those of the plaintiffs' witnesses"). Put differently, the IHO made precisely the sort of credibility determinations that warrant judicial deference, and the plaintiffs have not identified evidence in the record sufficient to meet their burden of persuading the Court to disturb the IHO's findings.[2]

---

[2] The plaintiffs also presented Nijole Gedutis, Parkmont's Dean of Students, as a witness. A.R. at 590–616. The plaintiffs protest that the IHO's determination "barely references" Ms. Gedutis's testimony. Pls.' Mot. for Summ. J. at 26. It is true that the IHO spilled relatively little ink on Ms. Gedutis, noting only that her testimony that Z.S. "was performing lower in Math" was contradicted by Z.S.'s report cards from Parkmont. A.R. at 28. It is telling, however, that the plaintiffs' brief makes no effort to explain what the IHO *should* have taken away from Ms. Gedutis's testimony. The Court has reviewed that testimony and notes that, on cross-examination, Ms. Gedutis stated that she had never taught Z.S. in a classroom, had never conducted an assessment or evaluation of her, never spoke with any of Z.S.'s DCPS teachers, kept no record of Z.S.'s behavioral infractions, and had shared no information with DCPS. *Id.* at 610–12. Ms. Gedutis's testimony was, at most, only marginally relevant to the question of whether DCPS violated its Child Find obligations, and irrelevant to the question of whether DCPS had denied Z.S. a FAPE by failing to prevent her from being bullied. That the IHO did not spend more time addressing this testimony is no reason to disturb his conclusions.

## 2.  Defendant's Witnesses

The plaintiffs also contend that the IHO erred by crediting five of DCPS's seven witnesses and "excusing the school system's failure to provide a cogent or responsive explanation for . . . the school system's failure to even consider evaluating her for special education services . . . ."  Pls.' Mot. for Summ. J. 20–23.   After review of the record, the Court disagrees: the five defense witnesses specifically identified by the plaintiff provided coherent explanations, backed by their expertise as educators, for the decisions they made with respect to Z.S.'s education.   The IHO could therefore reasonably credit and rely upon their testimony.  *See Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 404 (2017) ("[D]eference is based on the application of expertise and the exercise of judgment by school authorities.").

The first witness identified in the plaintiffs' motion, O'Kiyyah Lyons-Lucas, was the principal at Powell during Z.S.'s time as a student.  A.R. at 19, 917.  She claimed to have attended more than 1,000 IEP or eligibility meetings in the course of her sixteen-year career as an educator. *Id.* at 917–18.  She testified that Z.S. had been one of Powell's top students during her early years, and attributed Z.S.'s declining math and Spanish performance in fifth grade to the period of virtual instruction occasioned by the COVID-19 pandemic: formal Spanish instruction was limited and Z.S. was no longer surrounded by native Spanish speakers, which made it difficult for her to reacclimate to a bilingual in-person environment and instruction in Spanish. *Id.* at 19–20, 920, 938.  Ms. Lyons-Lucas further testified that she felt no need to refer Z.S. for an evaluation because "[t]here were no barriers for her accessing content and she was performing on grade level," and because "the educational impact of her anxiety was non-existent based on . . . [Z.S.'s] performance here in school." *Id.* at 922, 942.  She further testified that Z.S. would have been automatically eligible for transfer to the nearby Dorothy Height Elementary School, which provided instruction

in English, but that her parents never requested a transfer. *Id.* at 938. She conceded that one student had bullied Z.S. but maintained that the school responded appropriately by removing that student from Z.S.'s classroom. *Id.* at 20, 927. Finally, she noted that she did not consider Z.S.'s other peer conflicts to be examples of bullying because they were either not personally targeted at Z.S., showed no imbalance of power, or were in response to things that Z.S. did that frustrated her peers. *Id.* at 927–31.

The second witness, Dana Rosenberg, was Z.S.'s school counselor at Powell. *Id.* at 15, 713. Ms. Rosenberg testified that she worked with Z.S. during her second and third grade years, and that she felt that it was unnecessary to refer Z.S. for an IEP evaluation because "she had a 504 [P]lan that was . . . sufficient to accommodate . . . her needs." *Id.* at 714–15. She reasoned that Z.S. was doing very well academically and was "making great strides socially as well," leading her to conclude that additional services were "not needed." *Id.* at 716. She also testified that her only academic concern for Z.S. was her "avoidance of Spanish and talking more about Spanish," and that with respect to Z.S.'s relationships with other students, she observed "normal peer conflict." *Id.* at 723.

The third witness, Stephanie Fields, was Z.S.'s homeroom teacher and English teacher during her third-grade year. *Id.* at 19, 851. She testified that Z.S.'s academic progress was "on grade level and moving towards being above her grade level" during their time together. *Id.* at 19, 853. She also testified that Z.S.'s personal and social skills and work habits were "comparable to her peers." *Id.* at 856. She conceded on cross-examination that Z.S. had challenges with "peer relations, making new friends, communicating her feelings, [and] regulating emotions," *id.* at 863, but considered some of these problems to be "normal for someone her age, an 8 or 9-year old." *Id.* at 856. She also acknowledged that she observed certain worrisome behavioral issues, such as

hitting or "getting angry outwardly and upset," but that the episodes were sporadic.  *Id.* at 866–68.

Accordingly, she never felt that it would be appropriate to refer Z.S. for a special education

evaluation—something she had done about ten times in the course of her career as an educator—

for either academic or non-academic reasons.  *Id.* at 19, 856–57.  She expressed her view that the

504 Plans helped Z.S. and made her feel safer at school.  *Id.* at 865.  Finally, she recalled that Z.S.

would sometimes try to avoid math and Spanish classes, which she attributed to Z.S.'s aversion to

Spanish and her greater comfort with her native language.  *Id.* at 19, 857–58.

The fourth witness, Joselyn Reyes, was Z.S.'s fifth grade Spanish and math teacher.  *Id.* at

19, 886.  She testified that Z.S. was a good student, and that the relatively low grades she earned

in the first term of her fifth grade year were a normal and common byproduct of returning from

summer vacation.  *Id.* at 887–88.  Ms. Reyes remarked that Z.S. felt uncomfortable in her Spanish

language courses—math and Spanish class—despite having good Spanish comprehension and

pronunciation.  *Id.* at 19, 888–89.  Ms. Reyes recalled that Z.S. was one of, if not the only, non-

Latino student in her class, *id.* at 911–12, and opined that Z.S. was afraid to speak up in Spanish

because she feared being laughed at by her peers, despite the fact that her peers never laughed at

her and that Ms. Reyes observed little conflict in her classroom.  *Id.* at 19, 896, 900–01.  She

testified that, overall, Z.S.'s academic and non-academic performance was acceptable, and did not

feel it was necessary to refer Z.S. for a special education evaluation.  *Id.* at 896, 899.

The final witness specifically identified in the plaintiffs' motion is Morgan Hall, Powell's

assistant principal.  *Id.* at 15–16, 780.  Ms. Hall testified that Z.S. was able to "make appropriate

progress" and "access . . . the general education curriculum" from first through fifth grade.  *Id.* at

808.  She expressed her view that Z.S. did not have a problem with absences.  *Id.*  She testified

that Z.S.'s refusal to speak Spanish in class may have had negative implications for her peer

relationships, *id.* at 785–86, but disagreed that Z.S. was subject to bullying. *Id.* at 787. She described Z.S.'s peer conflicts as bidirectional, sometimes initiated by Z.S., and not characterized by a "power imbalance." *Id.* at 786. She also testified that the school was unaware of some of the supposed bullying because Z.S. did not report it to school authorities, which limited their ability to respond. *Id.* at 787–88, 835. She stated that she had participated in "probably 100" IEP eligibility meetings in her career, and that "it never came up to anyone in the team with the collective decades of experience that [Z.S. was] a student who needed a special education referral." *Id.* at 19, 796, 834. Ms. Hall formed her own opinion that Z.S. was not a good candidate for a special education referral because she was "performing quite well in her academics." *Id.* On cross-examination, she stated her belief that Z.S.'s 504 Plan was insufficient, and that Z.S. could have benefited from the social worker intervention that was added to and then removed from her Plan with Z.S.'s parents' agreement. *Id.* at 832–33. However, she maintained that special education was not the right answer for Z.S.'s problems because "she was being successful in her classes" and that despite her "relative weak points . . . she was accessing the curriculum." *Id.* at 833. She also defended the school's academic and social interventions and opined that Z.S. was removed from Powell before enough time had passed "to see if any of it worked." *Id.*

It is one thing for the plaintiffs to argue that Powell's staff failed to comply with their obligations under the IDEA, which is addressed in the sections that follow. But it something else entirely for the plaintiffs to argue that these witnesses "offered no explanation for [DCPS's] failure to evaluate Z.S." Pls.' Mot. for Summ. J. at 25. Indeed, DCPS's witnesses offered entirely coherent explanations, drawing upon their experience as educational professionals and their personal observations of Z.S., for why they did not see fit to refer her for a special education

evaluation.  Contrary to the plaintiffs' argument, the IHO did not err by relying on their testimony, nor did he wrongfully "excuse[]" any "lack of explanation" on the witnesses' part.  *Id.*

### B.  DCPS Did Not Violate Its Child Find Obligations by Failing To Evaluate Z.S.

The IHO found that DCPS did not violate its Child Find obligations.  A.R. at 21–28.  He reasoned (and both parties agree) that eligibility for special education requires more than the mere existence of some qualifying learning impediment, such as Z.S.'s separation anxiety; there must also be an educational impact attributable to that disability, and a concomitant need for specialized instruction.  *Id.* at 21–22.  The IHO concluded—based on Z.S.'s strong academic performance for most of her time at Powell, the testimony of DCPS's witnesses, and Z.S.'s improvements in math since switching to Parkmont's monolingual environment—that her "decline in Spanish-speaking courses suggests more of an aversion to Spanish than the effects of a disability."  *Id.* at 28.  The plaintiffs urge the Court to reject the IHO's determination, arguing that Z.S.'s known separation anxiety diagnosis, history of behavioral problems at school, and declining academic performance should have caused DCPS to identify Z.S. as a student potentially eligible for an IEP and refer her for an evaluation.  The fact that DCPS eventually evaluated Z.S. and deemed her to be eligible for an IEP, they argue, further suggests that the defendant erred by not conducting an evaluation while she was still enrolled at Powell.  These arguments are unavailing.

To understand why, it is helpful to consider what sort of circumstances courts have found to implicate a school's Child Find obligations.  All parties agree that a school has a duty to proactively identify and evaluate students who may be educationally impacted by a known disability and in need of special educational services.  However, "as several courts have recognized . . . Child Find does not demand that schools conduct a formal evaluation of every struggling student."  *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012).  Rather, "[t]o hold a

school district liable for failing to identify a student who should be evaluated for purposes of receiving special education, a 'claimant must show that school officials overlooked clear signs of disability and were negligent in failing to order testing, or that there was no rational justification for not deciding to evaluate.'" *Mr. P v. West Hartford Bd. Of Educ.*, 885 F.3d 735, 750 (2d Cir. 2018) (quoting *Bd. of Educ. of Fayette Cnty., Ky. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007)); *see also Legris v. Capistrano Unified Sch. Dist.*, No. 20-56261, 2021 WL 4843714, at *3 (9th Cir. Oct. 18, 2021) (finding no Child Find violation when "the record lack[ed] the kind of warning signs that would trigger [the school's] obligation to assess [the student] for an IEP").

Under the IDEA, "the core of educational performance is '*academic* performance.'" *Day*, 2021 WL 3507602, at *8 (quoting *Maus v. Wappingers Cent. Sch. Dist.*, 688 F. Supp. 2d 282, 294 (S.D.N.Y. 2010) (emphasis in original)).  So, if a student is meeting or exceeding academic standards for their grade levels and progressing on time from one grade to the next, a school may have no reason to submit the child to evaluation for special education.  *See D.K*, 696 F.3d at 250 (finding no Child Find violation in part because the student demonstrated "intermittent progress and even academic success in several areas"); *L.M.*, 478 F.3d at 314 (finding that the school district neither "overlooked clear signs of disability" nor lacked a "rational justification for failing to evaluate" in part because the student was "meeting expectations in all academic areas"); *G.S.*, 2022 WL 2233909, at *4 ("All of her teachers testified that G.S. performed at grade level, giving none of them any reason to suspect she required special education services.").  Moreover, even a dip in academic performance may not implicate a school's Child Find obligations if school officials have good reason to believe that the decline is attributable to something other than a disability.  *See, e.g.*, *E.H. v. McKnight*, No. 21-cv-2297-TDC, 2022 WL 3908630, at *12 (D. Md. Aug. 30, 2022) (finding no Child Find violation due to a recent decline in a student's otherwise strong pattern of

performance, because the school officials "reasonably could conclude that other issues . . . were responsible for his recent poor grades").

Where courts have found a student eligible under the IDEA *despite* the student's satisfactory performance in school, it has generally been due to some highly concerning behavioral signal. *See, e.g.*, *A.A. v. Dist. of Columbia*, No. 16-cv-248-RBW, 2017 WL 11589194, at *7–8 (D.D.C. Apr. 20, 2017) (holding that a student qualified as disabled under the IDEA despite "average or above-average academic performance" because she was hospitalized after an "intensely volatile six-week period, characterized by kicking, spitting[,] and cursing . . . requiring multiple adults to restrain her," attempted twice to jump out of her second-story bedroom window, and suffered from hallucinations and suicidal ideation); *Bd. of Educ. of Montgomery Cnty. v. S.G.*, No. 2005-cv-0323-DKC, 2006 WL 544529, at *2–5, *15 (D. Md. Mar. 6, 2006) (holding that a student needed special education despite maintaining facially satisfactory grades because the student heard voices commanding her to harm herself and her mother, became incontinent, and suffered from delusions); *Johnson v. Metro Davidson Cnty. Sch. Sys.*, 108 F. Supp. 2d 906, 918 (M.D. Tenn. 2000) (holding that a student qualified as disabled despite having grades that were "satisfactory in most cases" because her manic episodes and impulsivity—chasing a car that cut her off in traffic, "running away to Florida with a guy she barely knew," and bringing a loaded firearm to school, etc.—were so severe that she had been expelled from two schools).[3]

---

[3] The plaintiffs cite *N.G. v. Dist. of Columbia*, 556 F. Supp. 2d 11, for the proposition that Child Find obligations encompass even students with "superior intelligence" and, seemingly, for the proposition that schools must evaluate any child who is so much as suspected of having an impairment.  Pls.' Mot. for Summ. J. at 17.  In fact, *N.G.* is entirely consistent with the proposition that Child Find obligations are not normally implicated when a student is succeeding academically despite having a diagnosed learning impediment.  In *N.G.*, the court held that the school was on notice to evaluate N.G. for special education because she had been diagnosed with depression and ADHD, had attempted suicide and been hospitalized for suicidal ideation, had failed four classes in which she had previously received As and Bs, and because her parents had written letters to the school attributing N.G.'s poor performance to her diagnoses. *N.G.*, 556 F. Sup. 2d at 26–28.  The holding of *N.G.* is thus easily reconcilable with the principles discussed here, and the facts of *N.G.* are clearly distinguishable from the case at hand.

Finally, even if a school perceives that a student may need *some sort of intervention* to achieve academic and behavioral success, it does not automatically follow that the school must evaluate the student for an IEP. "'Special education' is mandated only when a disabled child needs it to access their education—in other words, when special education is the solution to the child's problem, and not some other accommodation or treatment." *Day*, 2021 WL 3507602, at *9. Accordingly, a school district is not required to "rush to an evaluation" immediately, particularly when it reasonably appears that the student's "needs could be sufficiently addressed by a 504 [P]lan" or some other intervention. *Price v. Upper Darby Sch. Dist.*, No. 15-131, 2016 WL 6033534, at *7 (E.D. Pa. Oct. 14, 2016); *see also D.K.*, 696 F.3d at 252 (holding that there was no Child Find violation in part because the school faculty "took proactive steps to afford [the student] extra assistance," such as additional time to complete assignments and one-on-one attention from specialists, and "worked closely with his parents to maximize his potential for improvement"); *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 272 (3d Cir. 2012) (holding that there was no Child Find violation in part because the school was "providing appropriate instruction and interventions before rushing to special education identification"); *Mr. P*, 885 F.3d at 751 (holding that it was not a Child Find violation for a school to "proceed deliberately" with monitoring and home tutoring before referring the student for evaluation); *McKnight*, 2022 WL 3908630, at *12 (holding that it

---

The plaintiffs also rely on *G.G. ex rel. Gersten v. Dist. of Columbia*, 924 F. Supp. 2d 273 (D.D.C. 2013), as proof of "the school system's obligation to timely evaluate students for special education." Pls.' Mot. for Summ. J. at 17. That case is entirely inapposite. In *G.G.*, the school was found to have violated its Child Find obligations because it failed to timely evaluate the student after his parents' attorney sent a letter to his high school principal specifically requesting an IEP meeting. *G.G.*, 924 F. Supp. 2d at 279. Here, however, the record reflects that although Z.S.'s parents generally inquired about IEPs on a handful of occasions, they never requested an evaluation. A.R. at 515, 532.

Lastly, plaintiffs cite *Springfield Sch. Comm. v. Doe*, 623 F. Supp. 2d 150 (D. Mass. 2009), for the notion that knowledge of a previously-diagnosed problem, combined with excessive absences, indicates the need for special education services. Pls. Mot. for Summ. J. at 18–19. But *Springfield* is easily distinguishable. In that case, the student missed thirty-three days of school between September and January of the 2007-2008 school year—*eleven times* the number of days that Z.S. missed over approximately the same period in the 2021-2022 school year. Moreover, at the time of his absences, the student in *Springfield* was already on an IEP, so the case is not especially instructive as to a school's Child Find obligations.

was not a Child Find violation for a school to "reinstitute[e]" certain "accommodations or refin[e] the Section 504 Plan" before "seeking to evaluate [the student] for special education").

Applying these principles to Z.S.'s case, the Court cannot conclude that the IHO erred in his decision that there was no Child Find violation.  To reiterate, the IHO found that Z.S. displayed almost uniformly strong academic performance up until the first term of her fifth-grade year.  Her report cards and the reflections of Powell's staff also demonstrated that, notwithstanding some behavioral challenges—such as talking out of turn, trying to exert control over conversations, trouble engaging in play with her peers, and occasional tantrums—she generally met her teachers' expectations for social and personal development.  Moreover, her aversion to Spanish was well-known to Powell's staff, so when her academic progress stalled in Spanish and math, the school could rationally attribute it to the Spanish language environment rather than to her diagnosed separation anxiety.  And to the extent that Z.S.'s disorder gave rise to any special academic or behavioral needs, the school officials testified to their belief that those needs could be adequately addressed by Z.S.'s 504 Plan and other intervention.  As detailed in this Court's discussion of the documentary record and DCPS's witness testimony, the record supports the IHO's conclusions, which the Court therefore will not disturb.  Because the school was neither "negligent in failing to order testing" for Z.S., nor lacking a "rational justification for not deciding to evaluate" her, there was no violation of the school's Child Find obligations.  *L.M.*, 885 F.3d at 750.

The fact that Z.S. was eventually evaluated by DCPS and determined to be eligible for an IEP does not cast doubt on the IHO's conclusions.  As already noted, the IDEA does not "countenance 'Monday Morning Quarterbacking,'" so Z.S.'s later-in-time qualification for an IEP is only relevant to Powell's Child Find obligations insofar as it sheds light on whether the school acted "objectively reasonabl[y]" in the first instance.  *Edward M.-R.*, 660 F. Supp. 3d at 97; *see*

*D.K.*, 696 F.3d at 252 (finding no breach of Child Find duties despite a "subsequent disability finding"); *cf. Jackson v. Dist. of Columbia*, No. 19-cv-197-TJK/DAR, 2020 WL 3318034, at *12 (D.D.C. June 2, 2020) (holding that a student's speech and language re-evaluation conducted after a due process hearing was "not probative" of whether the student's earlier IEPs should have included speech and language services because the school had "made reasonable conclusions about the causes and solutions to [the student's] educational needs based on information available to them at the time"); *Price*, 2016 WL 6033534, at *7 (holding that the student's "subsequent diagnosis" did not establish that the school district's initial evaluation, conducted three years earlier, was improper).

In this case, Powell's staff acted reasonably based on the information then available. They knew that Z.S. had separation anxiety but observed that she was generally able to participate successfully in a general education curriculum. They also attributed her modest school avoidance and struggles in math and Spanish to her aversion to speaking in Spanish, rather than to her separation anxiety or some other undiagnosed disability. Given these observations, they made the reasonable judgment that Z.S.'s behavioral challenges would be more appropriately addressed through interventions short of an IEP. Z.S.'s subsequent evaluation for an IEP, more than a year and a half after her removal from Powell, is inadequate proof unto itself that DCPS should have been on notice to evaluate Z.S. for special education while she was enrolled at Powell.[4]

---

[4] The plaintiffs argue not only that Powell violated its Child Find obligations during the 2021-2022 school year, but also during the 2022-2023 school year, when Z.S. was enrolled at Parkmont. The Court has no trouble concluding that, if there was no Child Find violation when Powell faculty were actively observing Z.S. every day, there was certainly no Child Find violation when she was enrolled at a different school, and thus no longer observable by Powell's staff.

### C.  DCPS Did Not Deny Z.S. a FAPE by Failing to Prevent Bullying

The plaintiffs' final argument is that DCPS inadequately responded to the bullying that Z.S. received, thereby denying her a FAPE.  The IHO rejected this argument, applying a four-part test attributable to an opinion from the District Court for the Eastern District of New York, *T.K. v. N.Y.C. Department of Education*, 779 F. Supp. 2d 289, 314–15 (E.D.N.Y. 2011).  As articulated by the IHO, that test asks: (1) was the student a victim of bullying; (2) did the school have notice of substantial bullying of the student; (3) was the school "deliberately indifferent" to the bullying, or did it fail to take reasonable steps to prevent the bullying; and (4) did the bullying "substantially restrict" the student's "educational opportunities?"  A.R. at 29.  Applying that test, the IHO concluded that the first prong was satisfied: as conceded by DCPS, Z.S. was bullied by at least one other student while at Powell.  *Id.* at 30.  However, he found that the school was not on notice of "substantial" bullying because Powell faculty did not perceive that Z.S. was engaged in an unusual amount of peer conflict.  Moreover, the conflict they did see evinced no physical component or imbalance of power, and Powell's staff further noted that Z.S. "rarely if ever" reported bullying to Powell's staff.  *Id.*  The IHO also held that Powell did not show "deliberate[] indifferen[ce]" because the record is replete with examples of bullying countermeasures that the school took, ranging from class-wide announcements to *ad hoc* discipline to the creation of a formal Safety Plan.  *Id.* at 30–31.  Finally, the IHO held that there was only one possible basis for the conclusion that the bullying restricted her educational opportunities: Z.S.'s school avoidance tendencies.  *Id.* at 31.  The IHO dispelled this argument, remarking that despite Z.S.'s stated wish to stay home from school, she had only two unexcused absences in fifth grade, and that her pattern of avoiding Spanish and math class was more probably attributable to her aversion to Spanish than to bullying. *Id.*

The plaintiffs protest that the IHO ignored or discounted various instances of alleged bullying in the record and unduly rewarded the school's lackluster response. The plaintiffs propose various definitions of bullying based on D.C. statutes and Department of Education bulletins, but do not propose an alternative test for determining whether bullying constitutes denial of a FAPE. Pls.' Mot. for Summ. J. 30–36.

The D.C. Circuit has not addressed whether a school's failure to prevent bullying can constitute denial of a FAPE, but another court in this District has determined that it can, and seemingly endorsed an articulation of the *T.K.* test quite similar to that used by the IHO: "whether school personnel [were] deliberately indifferent to, or failed to take reasonable steps to prevent bullying that substantially restricted a child with learning disabilities in her educational opportunities." *S.S. ex rel. Street v. Dist. of Columbia*, 68 F. Supp. 3d. 1, 14 (D.D.C. 2014) (quoting *T.K.*, 779 F. Supp. 2d at 316). This Court will adopt that approach as well, and hold that Powell's response to bullying did not deny Z.S. a FAPE.

DCPS's witnesses conceded, and the IHO acknowledged, that at least one student at Powell—the one who was removed from Z.S.'s classroom—bullied Z.S. in fifth grade. A.R. at 30, 763. The plaintiffs strenuously argue that a litany of other conflicts Z.S. experienced at school also constitute bullying. The Court need not decide that definitional issue for two reasons, either of which is sufficient by itself to uphold the IHO's determination: even if the other episodes identified by the plaintiffs qualify as bullying, the record does not suggest 1) that the school "failed to take reasonable steps to prevent bullying," or 2) that the alleged bullying "substantially restricted [Z.S.] in her educational opportunities." *S.S.*, 68 F. Supp. 3d at 14.

First, the record supports the IHO's conclusion that, far from being deliberately indifferent, Powell made substantial efforts to prevent Z.S. from becoming embroiled in peer conflicts. As

recounted above, Powell's staff scolded a student who had called Z.S. an offensive name, leading to an apology and reconciliation, A.R. at 11; made an announcement to the entire grade that teasing was not allowed, *id.*; removed a repeat offender from Z.S.'s class and threatened expulsion if he bullied her again, *id.* at 12; placed Z.S. in an acceleration group intended to help her form friendships, *id.* at 30, 172; updated her 504 Plan to provide for adult facilitation and prevention of conflicts, *id.* at 10, 165; and formulated a Targeted Student Safety Plan intended to disrupt peer conflict, especially outside of the classroom environment. *Id.* at 11–12, 187. Though DCPS witnesses reported that they were stymied in their efforts to prevent peer conflict because Z.S. declined to report these conflicts to them contemporaneously, *see e.g. id.* at 787–88, this limitation on the school's ability to respond cannot be fairly characterized as "deliberate[] indifferen[ce]" or a "fail[ure] to take reasonable steps" on the school's part. The IDEA does *not* require that a school succeed in remedying bullying; it requires that a school not respond unreasonably to known bullying that rises to the level of having an educational impact. *Cf. T.K.*, 779 F. Supp. 2d at 318 (analogizing to *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648–49 (1999), which held that Title IX does not "require funding recipients to 'remedy' peer harassment," but rather "merely to respond to known peer harassment in a manner that is not clearly unreasonable"). Powell responded reasonably, not indifferently, and therefore its response did not deny Z.S. a FAPE.

Second, the record also supports the IHO's conclusion that the peer conflict that Z.S. experienced, bullying or not, did not substantially restrict her educational opportunities. There are only two possible manifestations of educational impact in Z.S.'s fifth grade year that could plausibly be attributed to her peer conflicts: the decline in her academic performance, and her attempts to avoid going to class. With respect to her academic performance, the only classes in

which she performed below grade-level expectations were Spanish and math.  A.R. at 11, 176.

Neither the plaintiffs nor the record can explain why, if indeed Z.S. *was* suffering academically

from the peer conflicts she was experiencing, their effects would be limited to those two classes.

The IHO's explanation, based on testimony from DCPS's witnesses and Z.S.'s report cards, is

more consistent with the record: her decline in those classes was more probably due to her aversion

to Spanish, coupled with her relatively limited opportunities for Spanish conversation over the

preceding year and a half due to the onset of remote learning.  *Id.* at 28.  And with respect to her

class avoidance, the same principle applies: If Z.S. was avoiding school because of her peer

conflicts, then why did she have only two unexcused absences during the first term of her fifth-

grade year, *id.* at 176, and why did she overwhelmingly shirk her Spanish and math classes in

particular?  The IHO's determination provides a more logical explanation: Z.S. avoided Spanish

and math because of her aversion to Spanish.  *Id.* at 31.  Reaching this conclusion requires no

speculation: Z.S. often visited Ms. Fields to avoid attending classes taught in Spanish, and told

Ms. Fields explicitly that she didn't want to attend those classes.  *Id.* at 858.  Notably, bullying

was not mentioned as a reason for her visits.  *Id.* at 858.

　　　In sum, the plaintiffs have not met their burden of persuasion to demonstrate that Powell

denied Z.S. a FAPE by failing to prevent her from being bullied.

## IV.    CONCLUSION

　　　The IHO conducted a thorough hearing; made sound and rationale credibility

determinations based on the witnesses' qualifications, demeanor, and testimony; reviewed the

documentary evidence; and ultimately determined that Powell had neither violated its Child Find

obligations nor denied Z.S. a FAPE by failing to prevent her from being bullied.  The record amply

supports the IHO's determinations, which the Court therefore affirms.

Importantly, this is not to say that Powell did everything perfectly, or that none of Z.S.'s parents' complaints are legitimate. Ms. Lyons-Lucas, in a text message sent to H.S. upon learning that Z.S. would be withdrawn from Powell, apologized that Powell "failed Z.S. and your family this year." A.R. at 190. It is clear from the record that Z.S. struggled at Powell, and it may well be that some of those struggles can be fairly laid at the feet of Powell's administration. Nevertheless, Powell did not violate the IDEA or deny Z.S. a FAPE.[5]

Upon consideration of the entire record herein, and for the foregoing reasons, the Court **GRANTS** the defendant's Motion for Summary Judgment, and **DENIES** the plaintiffs' Motion for Summary Judgment.

Date: April 4, 2025

_____
Royce C. Lamberth
United States District Judge

---

[5] Accordingly, the Court need not reach the issue of whether Parkmont is a proper placement for Z.S.